The next matter, number 23-1945, Vivian Tseng et al. v. Welch Foods, Inc., a Cooperative et al. At this time, will Council for the Appellants please come to the podium and introduce themselves on the record to begin. Thank you, Mayor. Please, the Court, Stephen Rosenberg for the Appellants. Your Honors, I represent the plaintiffs and appellants who are all participants and former executives of Defendant Welch's. They were participants in a deferred compensation plan known as the PRP plan. It's a top hat plan, a form of deferred compensation for executives. The simple fact is that the Defendant's decisions with regard to the PRP plan and their actions, as well as the District Court's decisions, contradict the rules of interpretation of ERISA plans in this circuit. Council, would you be helpful, I think, to all of us, if you could try to clarify what body of law applies to our consideration of this appeal? By that, I mean there are suggestions that because this is a so-called top hat plan, many of the ERISA principles and rules that apply to disputes like this simply do not apply. And so that, in my mind, that poses the question, well, what body of law are we relying on? Are we simply relying on traditional contract principles that would continue to apply, or are there traditional ERISA principles that apply to this dispute? Could you please clarify that? Yes. Unfortunately, the answer to your question is a little bit of both. In a top hat plan, by statute, certain elements of ERISA do not apply. However, the claims that are at issue here are still subject to ERISA, the denial of benefits claim, which is really an ERISA language for describing a breach of contract. Under this Court's decision in Niebauer, it's treated as a contractual basis. How do you interpret this contract? But the Court read into the contract that when a top hat plan grants discretion to a plan administrator, you borrow the law of discretion under ERISA in this circuit, the arbitrary and capricious standards. Now, our position is that here, the decisions at issue were not, in fact, made by the plan administrator, the PRP committee. The only two members of the PRP committee who were participants in this process of lowering the interest rate, both have testified that all they did was recommend the reduction of the interest rate to the board, effectively a subcommittee of the board, but to the board, and the board is the only one with the power to make the decision. So what follows from that if the final decision here was really made by the compensation committee? I guess that's your contention, is that correct? And what follows from that? Does that necessarily mean that the de novo review applies rather than the arbitrary and capricious standard? What's the significance of that? So under Niebauer, the idea of what the standard of review is, is it's a contractual term. What does the contract say? Here, the contract did not grant the compensation committee the power to make the decisions. The contractual right, essentially the condition triggering discretion, is that the decision be made by the administrator of the PRP committee. As a result, and this is consistent with general ERISA principles that Niebauer borrows as a general rule, that when the decision is not actually made by the entity, the committee, that has been granted discretion under the contractual document, the arbitrary and capricious standard becomes inapplicable and you revert to any other, same as any other contract, to the de novo standard. So our take on the significance of that event is that the court steps away from the arbitrary and capricious standards under ERISA, does not read them into the TARPAC plan, and instead reverts to traditional breach of contract analysis and makes its own determination as to what the contract holds under the applicable test for interpreting a contract. Okay, so you argue that, in part, because this decision was made by the compensation committee, that committee inescapably was arguably tainted by a conflict of interest because they were concerned about saving a lot of money, $29 million for the company, and that influenced their decision. So how does that conflict of interest, as you argue it, interact with the de novo standard review that you say applies? How do those two factors interact? So the conflict of interest, and just to step back briefly, in the arbitrary and capricious standard, that has one meaning. But I understand the court to be asking, if this is a de novo standard, how does the conflict come into play? It comes into play in two ways. First of all, there is an element, and I believe under Niebauer, but frankly it's more discussed in the district court's decisions in the McCarthy line of cases against Mapfreight, there is a good faith element to the role of the contracting parties and how the decisions are made by the company here. Twenty-nine million reasons not to decide in favor of the plaintiffs and the participants, just as was the case in the Gallup case. That's a traditional contract doctrine, good faith. I mean, it's incorporated into every contract, in effect. Do you argue a breach of the obligation of good faith? Do you argue that in this case? We don't, and only because ERISA preemption doctrines would preclude that from being an actual cause of action. But we believe that as part of the denial of benefit claim, the 502A1 claim under ERISA, which is effectively ERISA's breach of contract claim, good faith is an inherent element of whether they've engaged in a breach or not by their decisions. So effectively, while it's not a freestanding cause of action, the violation of the covenant of good faith and fair dealing in a contract constitutes a breach of contract of the PRP plan itself. Now, counsel, let me ask you, counsel. What if the defendant, instead of having to worry about not making the profits, was making more profits and it changed from 9.5 to, let's say, 11.5? You know, to me, it's the same. You know, they're using the same expression. They're trying to be financially sound. So wouldn't that be possible? And if that happened, I guess you wouldn't be here. You wouldn't be complaining. Well, it depends on the context. It all factors into the general structure of the contract. In a shorthand version, 2.05 of the contract imposes an obligation to pay the benefits for life of the participant and the spouse. 2.04 says, how do you do this? What's the financing mechanism? What does it look like? 2.04a says the way you do that is you create a notional account. You get an actuary to do actuarial projections based on the assumption that you're going to pay out the lifetime benefits mandated in Section 2.05. Nowhere in the plan does it say that you can fail to pay those benefits out for life, and nowhere in the plan does it say that you can create an account balance that won't fund those lifetime benefits. The interest provision 2.04c simply says every year the account balance shall be increased by an interest credit and that the interest credit will be based on an interest rate set with the assistance of an actuary. They could, with the assistance of the actuary, be doing their actuarial math and conclude, as in your honor's example, that our interest rates are running too low, the account balance isn't sufficient to fund the benefits as we were contractually required to provide. Now it's going to be 11.5%. Let's say inflation runs amok. Now we have to raise it to get there. But the only contractual obligation there is that the interest rate be set in a way that the account balance will still fund the benefits for life. I thought you made clear in your briefing that you acknowledge that this is not a lifetime benefit. It's an actuarial lifetime benefit. It's not a for real lifetime benefit, right? Correct. So that if somebody were fortunate enough to live beyond the actuarial computed time, their account would go down to zero and they would not get any more benefits. You acknowledge that, don't you? I do. That is exactly what 2.06 in the plan means. The only way you can form this account balance at the time of retirement is using actuarial projections of lifespan. Okay. So when the interest rate was recalculated, what did that do to what you say is the promise of an actuarial lifetime benefit? Does it have the effect of dramatically reducing the payments for the actuarial lifetime benefits when calculated? It does and it's documented in the record and we have it for the court in there. It reduces for each of the participants for a number of years and for the more recent retirees who have a longer actuarial lifespan, a great number of years, the length of time of their benefits. They simply, none of them, with that reduction in interest rate, will be paid benefits for the actuarially projected lifespan as a result of the reduction of the interest rate. When the account balance was processed, was developed for each one using the interest rate of 9.5%, the number was set on the assumption at 9.5% this will pay it out for the actuarial lifespan. By reducing it to 4%, that's no longer the case. It will zero out much too early for each participant. So I think you'd be inclined to agree with this, so this is probably something that opposing counsel should respond to, but it strikes me that there's an illusory quality to this contract in the sense that if in any year the applicable interest rate could be reduced, that could have the effect of very much diminishing this pledge of a lifetime actuarial benefit, which is really what's happened here. In what way could the executives who are subject to this plan rely upon any supplemental pension compensation if every year the interest rate could be reduced? I mean, that strikes me as an illusory promise. I could probably agree with that. I agree with you it's an illusory promise. We think in reality Section 2.04c was probably a Scrivener's error. It probably shouldn't have been written that way, but what it did in the way they've interpreted it is make that promise of lifetime payments illusory and create a conflict, an ambiguity as to how do the participants enforce their right if the interest rate can change any time? And under this Court's ruling in Parmenter, you would have to declare it ambiguous because it doesn't answer that question, bring in the extrinsic evidence and have a fact finder address it. The record is clear that the extrinsic evidence shows that the plan sponsor, the contracting party, that same compensation committee, intended this document to not have an illusory structure to it, that it be promised for life, and that was their intent when they entered into the contract. Counsel, let me ask you, the fact that your client may have, let's say, a lifetime benefit, I don't see anything in the contract or the agreement that says it has to be 9.5. Am I correct? That's correct. They could set the account balances higher. They could have set it at an amount that, at a 0% interest rate, will zero out at the end of the actuarial life. The two just are linked together. You have to have an account balance high enough to match whatever interest rate you choose when you establish and fund this notional account. Anything else, Counsel? The issue to us, to pick up quickly where we left off a moment ago, in our briefing we make clear there's a substantial amount of evidence that the plaintiffs all believed they were being offered this, that the board members who put the plan into place were deliberately offering lifetime benefits so that they could recruit and retain executives. And the plaintiffs all relied on that promise. That's why they came there. That's why they stayed there. They had long careers in front of them, and they stayed there to get this benefit at the end. We believe all the elements necessary for estoppel in this case have been shown in the record and were shown to the district court. So even if you move away from the plan terms and the language of the plan and the breach of contract, it's our view they were entitled to the benefit on estoppel, which is essentially another way of answering Your Honor's question. The estoppel should have barred them from reading 2.04c as allowing it to make the benefit allusory. But don't you, under ERISA doctrine, don't you run into a problem if you're going to rely upon oral representations? I thought the law was fairly clear. If there's going to be any kind of an amendment to a plan, it's got to be in writing. Isn't that sort of basic ERISA doctrine? It is, Your Honor, except that we're not really relying upon oral statements. The plan itself says the benefit shall be paid for life. That's literally what they're relying on. But what is it? You referred to extrinsic evidence that you want the opportunity to bring forth. I thought you were talking about representations that were made by prior board members. Yes, that has to go to the extrinsic evidence for construing the contract, on which our view is when you bring that in, if there's a difficulty or an ambiguity in how you construe the allusory promise rendered by the 2.04c interest provision, that extrinsic evidence tells us what the contract inquiries meant. The separate estoppel doctrine is another way, frankly, of getting to the same question, which is it can't be allusory because in the document it says it shall be paid. The plaintiffs relied upon it. They acted upon it. And the defendant should be estopped for that reason from reading 2.04c the way that they are. Thank you, Counsel. Thank you, Your Honor. Let's hear from Counsel Fortwell-Stromitz. Please introduce yourself back on the record. Yes, good morning, Your Honors. Nipun Patel on behalf of the appellees. Your Honors, the District Court's opinion and order granting summary judgment should be affirmed. The Supreme Court of the United States has recognized that the ERISA plan document is at the center of every ERISA case. The District Court here enforced the express and unambiguous terms of the ERISA plan document. Now, Counsel is relying on Section 2.05 of the plan document to argue that there is an alleged promise of a lifetime benefit. But 2.05, as the District Court correctly recognized, expressly states that it's subject to Sections 2.06 of the plan, which clearly indicate that there is an account limitation on this plan, and it says notwithstanding any other provision of this plan, in no event will the amount of any payment made to a participant exceed the amount credited to the participant's account. It's a trumping provision to which 2.05 is subordinate. So what constraint would apply to this committee in deciding to reduce the interest rate? I mean, sort of the logic of your argument is that they're free to set the interest rate at any level they wish to, understanding that it will have a dramatic effect on the compensation, the pension benefits that the members of this committee will get. What constrains them in deciding to set the interest rate? Well, the constraint is set forth in Section 2.04c of the plan, which indicates that the interest rate shall be set with the assistance of an actuary. And that's what happened here. There was an actuary that was consulted, and she agreed that 4% was a reasonable rate at the time. And so... Okay, but reasonable in what sense? How does reasonableness relate to what the expectations of the members of this pension plan, the kind of benefits that they would get? I mean, how does... Reasonableness seems to be, as you presented, entirely focused on how much it's going to cost the company, not the effect it's going to have on the benefits of the members of this plan. Well, Your Honor, first, I would submit that the plan grants the plan administrator discretion in administering the plan. And one of the things that the plan administrator is required to do is to, on an annual basis, evaluate the interest rate with the assistance of an actuary and come up with what the appropriate interest rate credit should be that should apply to the participants' accounts. As far as the participants' expectations, they have to be constrained by the plan document. And the plan document expressly informed each of the participants that that not only should occur, but it would occur on an annual basis. The simple fact is, during their tenure as executives and administrators of the plan, who were also the beneficiaries of the plan, they didn't do that. But that does not mean, as the district court correctly recognized below, that the interest rate could not change. That's the genesis of this case. The interest rate is 9.5% during the plaintiff's tenure as executives. That's obviously beneficial to them. There's new management that comes in. There's new members of the plan administration committee. They actually follow the terms of the plan as they're duty-bound to do under ERISA. And there's an evaluation of the interest rate that's done. And the interest rate is set at 4%. So this recalculation, what effect did it have on their expectation that they would continue to get these benefits for their actuarial life term? The representation is that this recalculation of the interest rate dramatically affected the length of time that they would be getting these benefits. In fact, it would now be a period of time far less than their computed actuarial life benefit. Doesn't the record show that? Well, let me, if I could just step back one second here and try to reorient this idea of actuarial projected, what the account should be, right? And so if you look at Section 2.04, the only time that one factors in actuarial equivalence is as of the date of retirement. That is, the account balance is set as of your retirement date based on an actuarial projection, right? After that, the account balance will be debited every year when benefits are paid and it will be credited. It will increase based on the interest credit that's applied. There is no requirement under the plan, not in 2.04c or anywhere else in the plan, that the evaluation of the interest rate has to be somehow linked to this idea of actuarial equivalence or mortality. That's not required when the interest rate is being evaluated. And if the plan was, in fact, intended to do that, if it was intended to provide for a lifetime benefit or intended to provide for actuarial equivalence or factor in actuarial equivalence every time that the interest rate is evaluated, the drafters of the plan could have very well stated that. And that's not what's stated. On the contrary, all that is required is that the interest credit, in order an evaluation of the interest credit be done annually with the assistance of an actuary. And that's exactly what was done here. So at retirement, a actuarial lifespan, if you will, is calculated. I think that's what you said. Is that correct? Only as of participants, either their normal retirement date or their early retirement date. Okay. And so they've retired and they're now getting these supplemental pension benefits. And you're saying that every year during that period of retirement, this interest rate can be recalculated so that any expectation they have that they'll get benefits for the period of their actuarial lifetime could be changed each year so that, in fact, they don't get it. The period of their actuarial lifespan that was calculated at the time of retirement, that could just be changed every year. I think that's what you're saying. What I'm saying is that the interest credit applied to the account balance that's calculated as of the retirement date can be changed. And as far as their expectations are concerned, their expectations have to be constrained by what the plan document says. And the plan document clearly indicates that when your account balance reaches zero, you don't get any more payments. No, that part's clear, but perhaps I'm disbelieving. What does this plan promise them? The plan promises that as of the date of your early or normal retirement, there's going to be a calculation that will account for your actuarial projected lifetime, mortality, that will be one of the things that is taken into account when your account balance is set up. Right, as of your retirement date. After that, it promises them that their account balance will be increased annually by an interest rate credit. What it does not promise the participants is how much that interest credit will be. And what the plaintiffs in this case are arguing, Your Honor, is that it should have been fixed at 9.5%. And in fact, to Judge Helpe's point, if the interest rate were increased, we wouldn't have a lawsuit. The mere fact is they are upset with the level of decrease that was required. Counsel, from what you're saying for the interest rate, right now it went down from 9.5 to 4.0. But tomorrow, this is not a fixed phase change. It could go up to 11.5. It could go back down to 9. It could go on a yearly basis. It could change. That's correct. By credit. That's correct, Your Honor. And since, just for the court's information, since the time, since 2019, each year there has been an annual evaluation and it's been determined that 4% is a reasonable rate. This argument that somehow 2.04c is a Scribner's error, that was never briefed and it was not even argued below. So that's the first we're hearing that 2.04c is a Scribner's error. That argument is waived and it should be disregarded. Let me just briefly touch on the estoppel claim in the time that I have remaining. This court has never had occasion to recognize an estoppel claim under Section 502A3 of ERISA. And in the cases that have come before the court, including Guerra-Delgado, the court has held that the facts of those particular cases do not warrant application of the estoppel doctrine. This case is particularly inappropriate for recognizing estoppel for several reasons. First, the plaintiffs in this case have a remedy available under Count 1, which was 502A1B. So they should not be permitted to seek a duplicative estoppel remedy. And this is a top hat plan. And in top hat plans, there is no fiduciary duty owed to the participants. For example, to administer the plan in a court to benefit solely for the benefit of the participants. That's not required in a top hat plan, which was one of the questions that Your Honor had asked about. Counsel, could you address the conflict of interest issue that I had raised? First of all, do you agree that this record supports the conclusion that the final decision here on the reduction in the interest rate, that was made by the Compensation Committee, is that not? I do not agree with that, respectfully, Your Honor, because the Pension Restoration Plan Committee meeting minutes that are in the record, the actual evidence that's in the record states clearly that the Pension Restoration Plan Committee or the plan administrator... But they acknowledge in this record, they recommended this to the Compensation Committee and it would not have been implemented if the Compensation Committee had not made the decision that it did. Doesn't the record indicate that? The record actually indicates, Your Honor, I would disagree slightly. I think the record indicates that the committee's meeting minutes, the plan administrator's meeting minutes indicate they are making the change or adjusting the interest rate from 9.5% to 4%. There was an approval or a ratification of that decision by the Compensation Committee. But, Your Honor, at the end of the day, I think that issue is frankly somewhat irrelevant. One, because the conflict of interest argument was never fully developed below. They did not pursue discovery on the conflict of interest issue. It's not uncommon for there to be a structural conflict in the administration of an ERISA plan. Did the district court address the conflict? I don't believe that the district court... It did not, right? There was a request for discovery, which was denied. I mean, Denmark, our case in Denmark couldn't be any clearer that it has to be considered. The conflict has to be considered, assuming there is a conflict. Why wouldn't we remand at least on that issue for the district court to address it? Well, several reasons. One, I don't believe that the conflict of interest issue was squarely presented before the district court. Discovery on that issue was not requested, nor was it conducted. What they're arguing now is that there's a conflict of interest, allegedly because the Compensation Committee ratified the decision to... They're saying that they made the decision to adjust the interest rate. We believe that the evidence shows, or the record below shows, that it was actually just a ratification. Regardless, Your Honor... Is there a dispute of fact there? On which issue? On who's right. It doesn't matter, because at the end of the day, what you're being asked to review and what the district court was being asked to review is whether the denial of benefits was proper, right? And that claim... Taking into account any structural conflict, and the district court didn't address that. Exactly, because, again, it was not argued below, but there was no conflict of... They'd have to prove not only that there was a structural conflict, but that there was an actual conflict that influenced the decision to deny the benefits. And the evidence and the record below actually shows the opposite. It shows that members of the Pension Restoration Plan Committee who were not involved in the decision to adjust the interest rate decided the claims that the plaintiffs presented. Why was there all this attention to the $29 million that the company's going to save because of this reduction in the interest rate? That seemed to be a big deal. I'm not sure that that was a big deal. I don't know that I would agree with the plaintiff's characterization of that. And, again, this is a top hat plan where the motivations of the plan sponsor are not relevant because there's no fiduciary duty owed to the participants. When you're administering the plan according to its terms, which is what happened here, by definition, there cannot be a breach of the plan. So unless the Court has any other questions, for me it looks like I'm out of time. I'm out of time, excuse me. We would ask that the Court affirm the decision of the District Court below. Thank you, Your Honors. Thank you. Thank you, Counsel. Thank you. That concludes argument in this case.